**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

HARD CANDY, LLC,

      Plaintiff

v.

ANASTASIA BEVERLY HILLS, INC.,

      Defendant

Civil Action No. 1:16-cv-21203-KMW


# Defendant's Motion to Exclude Expert James T. Berger and Memorandum of Law in Support

Alan G. Greer
Florida Bar No. 123294
Mark A. Romance
Florida Bar No. 021520
Nathaniel M. Edenfield
Florida Bar No. 091034
RICHMAN GREER, P.A.
North Tower – 14th Floor
396 Alhambra Circle
Miami, FL 33134
(305) 373-4000
(305) 373-4099 (fax)
agreer@richmangreer.com
mromance@richmangreer.com
nedenfield@richmangreer.com

Louis T. Pirkey
(admitted *pro hac vice*)
Travis R. Wimberly
(admitted *pro hac vice*)
PIRKEY BARBER PLLC
600 Congress Ave., Suite 2120
Austin, TX 78701
(512) 322-5200
(512) 322-5201 (fax)
lpirkey@pirkeybarber.com
twimberly@pirkeybarber.com

*Counsel for Defendant Anastasia Beverly Hills, Inc.*

TABLE OF CONTENTS

Introduction ..................................................................................................... 1

Facts .............................................................................................................. 1

    A.    Plaintiff's Claims .............................................................................. 1

    B.    Berger's Expert Report ..................................................................... 3

Argument ........................................................................................................ 4

I.    Berger's testimony is unreliable and irrelevant. ............................................ 4

    A.    Berger did not follow proper survey protocol. ...................................... 4

        1.    Berger did not use a control. ...................................................... 5

        2.    Berger surveyed the wrong universe. ........................................... 7

        3.    Berger did not replicate actual marketplace conditions. ................ 11

        4.    Berger asked impermissibly leading questions. ............................ 13

    B.    Berger's survey is not a confusion survey. .......................................... 15

    C.    Berger's "expert" opinion does not follow logically from his survey
        data. ............................................................................................. 17

II.    Even if Berger's testimony were otherwise admissible, he should still be
    excluded under Federal Rule of Evidence 403. ............................................ 19

Conclusion .................................................................................................... 20

Certificate of Compliance with Local Rule 7.1 ...................................................... 21

Certificate of Service ......................................................................................... 22

## INTRODUCTION

Plaintiff's expert James T. Berger performed a consumer survey besieged with serious methodological flaws. He used no control. He surveyed the wrong universe. He failed to replicate actual marketplace conditions. He asked leading questions. These flaws alone warrant his exclusion. But even worse, as Berger has effectively conceded, his survey does not measure the very question Plaintiff intends him to testify about—consumer confusion.

This case shows the importance of the Court's "gatekeeping" function under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Berger's survey is unreliable and irrelevant to every claim and defense in this case. His testimony has no probative value, and allowing it would do nothing but confuse and mislead the factfinder.

## FACTS

### A.    Plaintiff's Claims

This is a lawsuit for trademark infringement and unfair competition. *See generally* ECF No. 1 ("Complaint"). Both parties are in the cosmetics business. Defendant Anastasia Beverly Hills, Inc. sells its cosmetics products through department stores (e.g., Macy's, Nordstrom, Dillard's) and through specialty beauty retailers (e.g., Sephora, Ulta). Complaint ¶¶ 16, 20-21. It also sells through the company's website, anastasiabeverlyhills.com. *Id.* In contrast, Plaintiff's cosmetics products are available exclusively through Walmart and Walmart.com. *See id.* ¶ 7.

1

Plaintiff's allegations stem from a cosmetics product formerly sold by Anastasia, called the "Gleam Glow Kit":

**Fig. 1: Gleam Glow Kit (front cover)**   **Fig. 2: Gleam Glow Kit (back cover)**



**Fig. 3: Gleam Glow Kit (inside)**



Exh. 1 [D's Depo. Exh. 17].

2

As the photos above show, the Gleam Glow Kit contained four shades of makeup. *Id.* Anastasia named the four shades *Hard Candy*, *Mimosa*, *Starburst,* and *Crushed Pearl. Id.* These shade names appeared on the inside and back of the kit, but not on the front of the kit. *Id.* The front of the kit prominently displayed three source-identifying marks: ANASTASIA BEVERLY HILLS, the "A" logo, and GLEAM GLOW KIT. *Id.*

This lawsuit relates to one of the Gleam Glow Kit's four shade names, *Hard Candy*. Plaintiff uses the trademark HARD CANDY on various goods, including cosmetics, and owns federal registrations. Complaint ¶¶ 7-10. According to Plaintiff, Anastasia infringed its trademark rights by using the words *Hard Candy* as one of the four shade names in the Gleam Glow Kit. Complaint ¶ 17. Plaintiff claims that Anastasia's use of this shade name is likely to confuse consumers.[1] *Id.* ¶¶ 22(b), 26, 36, 42, 50.

## B. Berger's Expert Report

In early January, Plaintiff disclosed an expert report from James T. Berger. Exh. 2 [Berger Report]. Berger's report discusses a survey he conducted of 251 consumers over the Internet. *Id.* ¶ 11 & attached survey.[2]

---

[1] Likelihood of confusion is the legal test for trademark infringement and unfair competition. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992).

[2] Berger attached the survey to his report, but the attachment does not have any page numbers. For the Court's reference, Berger's complete survey is located at PDF pages 32 through 37 of Exhibit 2 to this motion (which contains Berger's report and everything he attached to it). It begins with the title "Cosmetics Eveready."

Berger's report offers various (and at times, inconsistent) objectives for his survey. *See, e.g.*, *id.* ¶¶ 1, 11. *But see, e.g.*, *id.* ¶¶ 8-9. In the last sentence of his report, Berger opines for the first time that the shade name *Hard Candy* in Anastasia's Gleam Glow Kit "create[d] confusion" among consumers. *Id.* ¶ 18. As discussed below, that conclusion does not follow from Berger's unreliable and irrelevant survey.

## ARGUMENT

Berger's expert testimony should be excluded. It does not meet *Daubert*'s standards for admissibility. And even if it did, the Court should still exclude it under Federal Rule of Evidence 403. The risk that Berger's testimony will mislead the factfinder and confuse the issues outweighs whatever probative value Plaintiff believes it has.

## I.   Berger's testimony is unreliable and irrelevant.

*Daubert* imposes two requirements on expert testimony: reliability and relevance. *See* 509 U.S. at 589. These two requirements apply to all types of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Berger fails on both. His survey is unreliable, disregarding mountains of authority on proper survey protocol. It is also irrelevant. It does not measure what Plaintiff believes it measures—consumer confusion. Whatever it measures, if anything, has no probative value to the issues in this case.

### A.   Berger did not follow proper survey protocol.

The *Manual for Complex Litigation* offers seven guidelines for a proper survey: (1) the population was properly chosen and defined; (2) the sample chosen was representative of that population; (3) the data gathered were accurately reported; (4)

4

the data were analyzed in accordance with accepted statistical principles; (5) the questions asked were clear and not leading; (6) the survey was conducted by qualified persons following proper interview procedures; and (7) the process was conducted to ensure objectivity. Federal Judicial Center, *Manual for Complex Litigation* § 11:493 (4th ed. 2004).

Arguably, Berger's survey fails on all seven guidelines. This motion will focus on four particular failures, all of which show the unreliability and irrelevance of Berger's survey and testimony.

### 1.    Berger did not use a control.

As the leading trademark treatise explains, a proper consumer survey "should have a control." 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 32:187 (4th ed. 2014) (McCarthy treatise sections attached as Exhibit 3). Including a control is crucial because it allows the researcher to eliminate "noise" from the survey results. Michael Rappeport, *Litigation Surveys—Social "Science" As Evidence*, 92 Trademark Rep. 957, 979, 983-87 (July & August 2012). Among other reasons, noise exists because respondents know they are responding to a survey—their reactions are not being measured in a real, organic marketplace. *Id.* at 980.

A control allows the researcher to "subtract" this noise. *Id.* at 986. In this way, a survey's control is like the placebo in a drug test, and like police detectives' including multiple people in a criminal lineup. *Id.*; *accord* 6 McCarthy, *supra*, § 32:187. "[N]o one would trust the results of a 'lineup' in which witnesses were shown

5

only the suspect," and likewise, no one should trust "the results of a litigation survey without any controls." Rappeport, *supra*, at 986.

In trademark lawsuits, courts have "come to expect" that surveys will include a control. 6 McCarthy, *supra*, § 32:187. More often than not, courts recognize the absence of a control as a "fatal weakness." *Id.* (quotation omitted). Courts in trademark cases—including this Court—have not hesitated to exclude experts who performed surveys without a control.[3]

Despite this clear authority, Berger concededly did not use a control. *See* Exh. 2 [Berger Report] ¶ 14. He claims a control was unnecessary because his survey did not test "causation." *Id.*; *accord* Exh. 4 [Berger Depo.] at 122:23-123:16. Yet this position only confirms why the Court should exclude him.

First, by admitting that his survey did not test causation, Berger gives the game away: his survey *is not really a consumer-confusion survey*. *See infra* Part I.B. A confusion survey necessarily tests causation. *See* Jacob Jacoby, *Trademark Surveys Volume I: Designing, Evaluating, & Implementing Surveys* 216-18 (ABA 1st ed. 2013) (excerpts attached as Exhibit 5). This is because trademark law asks whether the defendant's conduct was "likely *to cause* consumer confusion." *Custom Mfg. & Eng'r, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (emphasis added); *accord* 15 U.S.C. §§ 1114(1), 1125(a)(1)(A). Returning to the example above, a

---

[3] *E.g.*, *First Data Merchant Servs. Corp v. SecurityMetrics, Inc.*, No. RDB-12-2568, 2014 WL 6871581, at *4-5 (D. Md. Dec. 3, 2014); *MPS Ent'mt, LLC v. Abercrombie & Fitch Stores, Inc.*, No. 11-24110-CIV, 2013 WL 3288039, at *11 & n.12 (S.D. Fla. June 28, 2013); *NFL Props., Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665 (E.D. Wis. 1999).

"confusion" survey that fails to test causation would be like a drug trial that fails to test whether the drug (as opposed to some other factor) improved the patients' symptoms.

Second, the lack of a control means Berger had no way to subtract noise from his survey results. *See* Rappeport, *supra*, at 980, 985-86. As noted above, survey respondents may react differently than they would in a real marketplace. *Id.* at 980. For example, respondents often assume the survey questions have "correct" answers and try to guess them. *Id.* at 983; 6 McCarthy, *supra*, § 32:172. Noise can also arise from pre-existing beliefs, bias, leading survey questions, etc. *See, e.g.*, *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 547 F. Supp. 2d 491, 501 (D. Md. 2008) (noting survey expert's use of a control to "subtract[]" this noise).

Without a control, Berger left himself no way to account for these distortions—much like a drug trial without a placebo or a criminal lineup with only one suspect. The Court could easily exclude Berger on this basis alone. *See* 6 McCarthy, *supra*, § 32:187 ("fatal" weakness not to include a control). And when combined with Berger's other methodological flaws described below, his failure to use a control becomes even more troubling.

### 2.    Berger surveyed the wrong universe.

The "first step" in designing a consumer survey is determining the universe to be surveyed. *Id.* § 32:159. The universe is the "segment of the population whose perceptions and state of mind are relevant to the issues in the case." *Id.* Choosing the correct universe is crucial. If the wrong people are surveyed, "the results are likely to

be irrelevant." *Id.*; *accord, e.g.*, *Amstar Corp v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980).[4]

"The 'appropriate universe should include a fair sampling of those purchasers most likely to partake of *the alleged infringer*'s goods or services.'" *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 533 F. Supp. 75, 84 (S.D. Fla. 1981) (quoting *Amstar*, 615 F.2d at 264) (emphasis added). Under this bedrock principle, Berger surveyed the wrong universe. Instead of surveying the most likely consumers of *Anastasia's* products, he surveyed the most likely consumers of *Plaintiff*'s products. Specifically, Berger surveyed women age 18-35 "who have purchased or intend[] to purchase cosmetics products at Walmart or at Walmart.com." Exh. 2 [Berger Report] ¶ 10; Exh. 4 [Berger Depo.] at 94:2-14, 98:19-99:16; *see* Complaint ¶ 7 (Plaintiff's cosmetics are available exclusively through Walmart and Walmart.com).

At his deposition, Berger was asked why he did not survey a universe of Anastasia's likely customers. Exh. 4 [Berger Depo.] at 94:5-6. He responded that this wouldn't "make any sense" because "[Anastasia's] target market *would have absolutely no awareness of the plaintiff's products*." *Id.* at 94:5-9 (emphasis added).

The significance of this admission is hard to overstate. On the one hand, Berger recognizes that Anastasia's customers are not even aware of Plaintiff. *Id.* Yet on the other hand, he opines (without evidence) that Anastasia's customers were somehow confused into thinking of Plaintiff when they bought the Gleam Glow Kit. Exh. 2

---

[4] As a pre-October 1981 Fifth Circuit decision, *Amstar* is binding authority in the Eleventh Circuit and in this Court. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[Berger Report] ¶ 18; *see also infra* Part I.C. This contradiction should tell the Court all it needs to know about Berger's testimony.

Berger also tried to rehabilitate his improper survey universe. He claimed that surveying Plaintiff's most likely consumers—instead of Anastasia's—was proper because this is a "reverse confusion" trademark case. Exh. 4 [Berger Depo.] at 93:5-95:13. In a reverse-confusion case, consumers buy the senior user's (i.e., the *plaintiff's*) product mistakenly believing that they are getting a product affiliated with the junior user (i.e., the *defendant*). 4 McCarthy, *supra*, § 23:10. The defendant—usually a much larger company—"saturates the market" and "overwhelms" the plaintiff. *Id.* This contrasts to a traditional "forward" confusion case, where consumers buy the *defendant's* product mistakenly believing that they are getting a product affiliated with the *plaintiff. Id.*

This is not a reverse-confusion case. Plaintiff's own deposition testimony makes clear that Plaintiff is alleging *forward* confusion—i.e., that consumers who bought Anastasia's Gleam Glow Kit mistakenly believed they were getting a product affiliated with Plaintiff:

- "[W]hen you look at this [Gleam Glow Kit] and see the brand Hard Candy as part of the kit, I think there is obvious confusion for anybody who's going to buy the kit *thinking that they are buying Hard Candy*."

- "[I]f a customer buys this [Gleam Glow Kit] and one of the items is called Hard Candy, *they might as well say I already got my Hard Candy product, I don't need to go out and buy another Hard Candy product today*."

- "I think once they buy [Anastasia's Gleam Glow Kit], *they feel they already got their Hard Candy color*."

Exh. 6 [Falic Depo.] at 141:21-25, 152:17-21, 154:4-5 (emphasis added).

9

Consistent with this testimony, Plaintiff's complaint alleges forward confusion: "Defendant's activities are likely to lead the buying public to conclude, incorrectly, that Defendant's goods originate with, are authorized by, or are associated with Plaintiff's *Hard Candy* brand." Complaint ¶ 27; *accord id.* ¶¶ 22, 35-36, 43, 49-50. Likewise, Plaintiff alleges that the Gleam Glow Kit was a "blatant attempt to . . . feed off of Plaintiff's success and fame." *Id.* ¶ 17. That is a forward-confusion theory. *See* 4 McCarthy, *supra*, § 23:10 ("[I]n a reverse confusion case, the junior user is not trying to take a free ride on the reputation of the senior user's mark . . . .").

Berger admitted that his universe would have been "totally different" if he had known this was a forward-confusion case. Exh. 4 [Berger Depo.] 96:8-16. This is because, in a reverse-confusion case, the relevant universe is the plaintiff's potential customers; but in a forward-confusion case (as here), the relevant universe is the defendant's potential customers. 4 & 6 McCarthy, *supra*, §§ 23:10, 32:159; *accord, e.g., Amstar*, 615 F.2d at 264; *Brooks Shoe*, 533 F. Supp. at 84. For this reason, Berger agreed it's "important" to determine which type of confusion is being alleged. Exh. 4 [Berger Depo.] at 95:15-22. Yet he never made this determination. *Id.* at 95:24-96:4.

Because this is a forward-confusion case, Berger surveyed the wrong universe.[5] This error makes his survey unreliable and "irrelevant," 6 McCarthy, *supra*, § 32:159, and it gives the Court yet another reason to exclude him.

---

[5] *See, e.g., Amstar*, 615 F.2d at 264 (disregarding survey-expert testimony in forward-confusion case because universe did not include defendant's likely consumers); *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181-82 (D. Kan. 2007) (similar reasoning—universe was slanted toward plaintiff's customers, not defendant's; excluding survey expert's testimony).

### 3.    Berger did not replicate actual marketplace conditions.

A confusion survey must "replicat[e]" actual marketplace conditions. *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999). This means the survey must use a "proper stimulus," one that shows the defendant's allegedly infringing product as real consumers would have encountered it. *Id.* The survey stimulus must show the defendant's *entire* product "as sold in the marketplace, not just a portion of it." Jacoby, *supra*, at 155.

Berger broke this basic rule. His survey's only stimulus is a photo (see Figure 4 below) showing just part of Anastasia's Gleam Glow Kit—the inside. He did not show respondents the front or back of the kit. *See id.* This incomplete representation comes nowhere close to replicating how the kit appeared in the actual marketplace:

**<u>Fig 4: Berger's Survey Stimulus</u>[6]**



---

[6] Exh. 2 [Berger Report], survey attachment, Question No. 13.

**Fig. 5: Actual Gleam Glow Kit (front cover, inside, & back cover)[7]**

  

It also appears that Berger's stimulus photo was doctored to enlarge the four shade names, including *Hard Candy*. This difference is apparent when comparing Figures 4 and 5 above (as a reference point, compare how far the shade names extend relative to the semi-circle divots in the bottom right of the four makeup pans). It is also apparent when comparing Berger's photo (Figure 4) to the photos in Plaintiff's complaint. *See* Complaint ¶ 17.

By using a doctored photo (regardless of who doctored it), Berger worsened the already serious disconnect between his survey and the actual marketplace. If readability of the shade names were the problem, Berger could have simply enlarged the entire photo. Instead, he used a photo in which *only* the shade names were enlarged, increasing their prominence relative to the rest of the kit's interior. This modification easily could have skewed the survey results. And of course, Berger had no way to account for this because he didn't use a control. *See supra* Part I.A.1.

---

[7] Exh. 1 [Depo. Exh. 17]; *see also supra* p. 2.

Berger's survey stimulus thus misrepresented the actual marketplace in two key ways. First, it "eliminate[d] key identifiers" (Jacoby, *supra*, at 158) on the Gleam Glow Kit. Unlike consumers in the real world, Berger's survey respondents did not see the prominent marks on the kit's front cover—i.e., ANASTASIA BEVERLY HILLS, the "A" logo, and GLEAM GLOW KIT. Exh. 1 [Depo. Exh. 17]. Second, Berger "plac[ed] undue emphasis on particular features." Jacoby, *supra*, at 158. Specifically, his stimulus unduly emphasized *Hard Candy* and the other three shade names. It did so not only by omitting the front and back of the kit, but also by using the doctored photo with the shade names enlarged.

Courts have excluded survey experts who, like Berger, failed to approximate the real-world marketplace conditions of the defendant's product. As one court aptly explained, "A survey that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007). So too here.

### 4. Berger asked impermissibly leading questions.

"To be reliable, a survey should not contain leading questions." *Hutchinson v. Essence Commc'ns, Inc.*, 769 F. Supp. 541, 564 (S.D.N.Y. 1991); *accord MPS Entm't*, 2013 WL 3288039, at *11. Leading questions can include, for example, initial questions that lead the respondent to the desired answer before the survey asks the critical question; questions that imply the "correct" answer (or that there is one); questions suggesting a possible answer that may not have otherwise occurred to the respondent; and questions with biased phrasing. *See* 6 McCarthy, *supra*, § 32:172.

Berger's survey questions were leading in at least three different ways. First, by repeatedly referring to the "Hard Candy *brand*," Berger's questions told respondents that HARD CANDY is, in fact, a brand. At his deposition, Berger halfheartedly disputed this. *See* Exh. 4 [Berger Depo.] at 108:15-109:9. But when asked why he included the word "brand," he let the cat out of the bag: "Because Hard Candy is, in effect, a brand of products." *Id.* at 109:10-19. Trouble is, the respondents did not necessarily *know* that Hard Candy is a "brand of products"—at least, not until Berger's survey questions impermissibly told them so.

Second, Berger asked these multiple "Hard Candy brand" questions *before* asking the survey's critical question: "Do you believe 'Hard Candy' cosmetic products are put out by a single company or more than one company?" Exh. 2 [Berger Report], survey attachment, Question No. 18. This sequencing leaves no way to know whether the 47% of respondents who answered "a single company" to Question No. 18 did so because the survey had just repeatedly told them that Hard Candy is a brand, or because of some other reason.

Finally, before asking any substantive questions about "Hard Candy," Berger showed respondents the stimulus photo above with the words *Hard Candy* (doctored to enlarge them) on an unidentified cosmetics product. *See supra* p. 11 (Figure 4). Berger admitted to doing this because he wanted to lead the respondents: "I just wanted them to know that 'hard candy' was being used in a way that they may not have been aware that it was being used." Exh. 4 [Berger Depo.] at 108:3-8.

14

Berger's leading questions make his survey unreliable. As this Court once said when excluding an expert, "A survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion." *MPS Entm't*, 2013 WL 3288039, at *11.

**B.    Berger's survey is not a confusion survey.**

Without anything else, the serious methodological flaws in Berger's survey call for exclusion. Yet his proposed expert testimony also suffers from an even more basic problem. Put simply, Berger's survey does not measure the question Plaintiff intends him to testify about at trial. It is not a consumer-confusion survey.

There are two well-accepted formats for confusion surveys: the "*Eveready*" format and the "*Squirt*" format. 6 McCarthy, *supra*, § 32:173.50. In the *Eveready* format, the survey shows the defendant's product and then asks questions along these lines:

1. Who do you think puts out the [product] shown here?

2. What makes you think so?

3. Please name any other products put out by the same company which puts out the [product] shown here.

*Id.* § 32:174. In the *Squirt* format, the survey shows both parties' products and then asks, "Do you think [these products] are put out by the same company or by different companies?" *Id.* § 32:173.50. (For the Court's reference, Exhibits 7 and 8 contain the *Eveready* and *Squirt* court decisions with the survey questions highlighted.)

The *Eveready* and *Squirt* formats both share an important common trait: they ask questions *about the defendant's allegedly infringing product* to see whether (and

15

why) respondents think it has some connection to the plaintiff. *See id.* §§ 32:173.50, 32:174, 32:175. Indeed, that is the whole point of a confusion survey. *See id.* § 32:175.

Here, Berger conceded to using neither format. Exh. 9 [Berger Supplemental Report] ¶ 5; Exh. 4 [Berger Depo.] 6:19-24, 121:24-122:1. When asked why the survey's first page says "Cosmetics Eveready," he claimed this was just a mistake. Exh. 4 [Berger Depo.] 121:12-19. Berger's failure to use either accepted survey format should give the Court serious pause.

But more importantly—and this is the real crux of the issue—whatever survey format or variation Berger wanted to use, he needed to ask questions *that measure consumer confusion*. He did not. He asked no questions about Anastasia's Gleam Glow Kit. He asked no questions about Anastasia's use of the words *Hard Candy*. He asked no questions about whether consumers think the Gleam Glow Kit has some connection to Plaintiff (and if so, why they think that). Instead, he showed respondents a photo of the kit's interior but then never asked any questions about it. *See id.* at 108:3-14; *see also supra* p. 11 (Figure 4).

Put simply, Berger's survey "fail[s] to ask any question that would test the critical question of [confusion]." *The Learning Network, Inc. v. Discovery Commc'ns, Inc.*, 153 F. Supp. 2d 785, 791 (D. Md. 2001) (excluding a survey expert). And Berger himself admitted this. Exh. 4 [Berger Depo.] at 145:6-13. Whatever Berger's survey measures, it does not measure confusion.

16

## C.     Berger's "expert" opinion does not follow logically from his survey data.

The final paragraph of Berger's report—titled "Summary and Opinions"—illustrates the startling disconnect between what his survey actually measures and the "expert" opinion Plaintiff plans for him to offer at trial. Berger writes:

> The Plaintiff's target market shows a high awareness of the "Hard Candy" brand and recall seeing it both [in] retail stores and on-line. A majority correctly believe that the "Hard Candy" brand emanates from a single source. "Hard Candy" is a trademarked brand and not a color. *The Defendant's use of "hard candy" as the name of a color of shade, in my opinion, <u>creates confusion</u> for those who recognize the "Hard Candy" brand and perceive that it emanates from a single source.*

Exh. 2 [Berger Report] ¶ 18 (emphasis added).

To put it politely, this paragraph is a non sequitur. The first two sentences allude to a concept called secondary meaning,[8] which is not at issue in this lawsuit. The third sentence contains two propositions: the former is not disputed (HARD CANDY is a "trademarked brand"), and the latter Berger admitted he merely

---

[8] Secondary meaning is a trademark-law doctrine that asks whether consumers have come to perceive a term as indicating a single company's products or services. *See Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007). Trademark owners need to prove secondary meaning when an opposing party challenges their rights by arguing that the term is merely descriptive. *See id.* The trademark owner can prove this by offering survey evidence showing that consumers associate the term with a "single source." *See* 2 McCarthy, *supra*, § 15:42. Berger invoked this "single source" idea several times throughout his report and his survey, including in the first two sentences quoted above. *See, e.g.*, Exh. 2 [Berger Report] ¶¶ 1, 11, 12, 15, 16, 18 & survey attachment (Question 18).

But secondary meaning is not disputed in this lawsuit. Plaintiff's HARD CANDY registrations are incontestable, which means there is a conclusive presumption of the marks' validity. *See* 15 U.S.C. § 1115(b). And indeed, Anastasia does not challenge Plaintiff's rights. Rather, Anastasia simply argues that the Gleam Glow Kit did not infringe those rights.

assumed and did not test in his survey (whether the words *Hard Candy* could describe the properties of a color). Exh. 4 [Berger Depo.] at 144:2-18.

The final sentence (emphasized above) is the only one in Berger's entire report where he expresses any opinion about consumer confusion. It comes out of nowhere. Nothing in the sentences before—nor anything else in his report or survey—provides any support for it. Berger all but admitted this. *See* Exh. 4 [Berger Depo.] at 144:23-145:24.

Tellingly, Berger's unexplained opinion in this final sentence contradicts his own representations about what his survey tested. As discussed above, Berger admits that his survey did not test causation. *See supra* pp. 6-7. And because his survey did not test causation, Berger has no grounds to opine on whether the Gleam Glow Kit "create[d]" confusion. *Id.* ¶ 18. After all, to *create* something means to "cause" it or to "bring [it] into existence." Merriam-Webster, *Definition of* CREATE, https://www.merriam-webster.com/dictionary/create (last visited March 8, 2017).

In short, Berger's ultimate opinion is completely divorced from his survey data. Luckily, the Supreme Court has addressed this situation. In *General Electric Co. v. Joiner*, the district court excluded expert testimony because the experts' data did not support their opinions. 522 U.S. 136, 140-41, 145-46 (1997). In the Supreme Court, the party offering the experts argued that *Daubert* allows district courts only to evaluate the expert's principles and methodology, not the expert's ultimate opinions. *Id.* at 146.

18

The Court rejected this argument. *Id.* In doing so, it gave district courts broad discretion to examine the analytical link between experts' data and their opinions. *See id.* "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* The district court may conclude there "is simply too great an analytical gap" between the data and the opinion. *Id.* When that happens, the court does not abuse its discretion by excluding the expert. *Id.*

These principles apply here. Even if this Court could overlook the myriad flaws in Berger's survey methodology, Berger's baseless opinion about consumer confusion does not follow from his survey data. The gap is simply "too great" (*id.*) to allow his testimony.

## II. Even if Berger's testimony were otherwise admissible, he should still be excluded under Federal Rule of Evidence 403.

For the reasons just explained, Berger's survey and testimony are inadmissible under *Daubert*. But the Court should also exclude him for another reason. His testimony creates a serious risk of misleading the factfinder and confusing the issues. *See* Fed. R. Evid. 403. So even if his testimony were otherwise admissible (it is not), these risks would substantially outweigh any probative value. *See id.*

*Daubert* is not the only hurdle to admitting expert testimony. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999). Even if the testimony satisfies *Daubert*, the court should still consider its admissibility under other rules of evidence, including Rule 403. *Id.* The Supreme Court has explained why this is so important: "Expert evidence can be both powerful and quite misleading . . . . Because

of this risk, the judge in weighing possible prejudice against probative force under [Rule 403] exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quotation omitted).[9]

Berger's testimony will mislead and confuse. As explained, his survey did not measure consumer confusion. At absolute most, it may have measured secondary meaning, an issue with no relevance to this lawsuit. *See supra* p. 17 n.8. Yet if Berger testifies, the mere fact that he's an "expert" could give his testimony "talismanic significance." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (en banc). Naturally, a jury would assume that the Court allowed him to testify because he has something useful to say. *See Daubert*, 509 U.S. at 595. And then a jury may attempt to cram a square peg (i.e., Berger's testimony) into a round hole (i.e., a case with no issues on which his testimony provides any evidence).

Anastasia asks the Court to prevent this needless risk. Berger's testimony will not benefit the trial; it will only invite misunderstanding and error. There is no good reason to take that chance.

## CONCLUSION

The Court should exclude Berger's survey—and any expert testimony based on it—under *Daubert* and Federal Rule of Evidence 403.

---

[9] Heeding the Supreme Court's advice in *Daubert*, many courts have used Rule 403 to exclude survey experts in trademark cases. *E.g.*, *Starter Corp v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307-08 (S.D.N.Y. 2001); *Simon Prop. Grp., LP v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1041, 1050-51 (S.D. Ind. 2000).

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Under L.R. 7.1, Defendant's counsel conferred with Plaintiff's counsel in a good-faith effort to resolve the issues raised in this motion. The parties have not been able to resolve the issues, and Plaintiff opposes the relief sought.

DATED: March 10, 2017                    Respectfully submitted,

s/ Mark A. Romance                       s/ Travis R. Wimberly
Alan G. Greer                            Louis T. Pirkey (admitted pro hac vice)
Florida Bar No. 123294                   Travis R. Wimberly (admitted pro hac
Mark A. Romance                          vice)
Florida Bar No. 021520                   PIRKEY BARBER PLLC
Nathaniel M. Edenfield                   600 Congress Ave., Suite 2120
Florida Bar No. 091034                   Austin, TX 78701
RICHMAN GREER, P.A.                       (512) 322-5200
North Tower – 14th Floor                 (512) 322-5201 (fax)
396 Alhambra Circle                      lpirkey@pirkeybarber.com
Miami, FL 33134                          twimberly@pirkeybarber.com
(305) 373-4000
(305) 373-4099 (fax)
agreer@richmangreer.com
mromance@richmangreer.com
nedenfield@richmangreer.com

Counsel for Defendant Anastasia Beverly Hills, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2017 a true and correct copy of the foregoing document was electronically filed with the Clerk using the CM/ECF filing system and served upon on all counsel of record or pro se parties below, either via transmission of Notices of Electronic Filing generated by the CM/ECF filing system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing:

Kevin Kaplan
Gabriel Groisman
COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse 1
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261
kkaplan@coffeyburlington.com
ggroisman@coffeyburlington.com
yvb@coffeyburlington.com
service@coffeyburlington.com

*Counsel for Plaintiff Hard Candy, LLC*

s/ *Mark A. Romance*
Mark A. Romance

22